**KIWI CODERS CORPORATION and James G. McKay, Plaintiffs-Appellees,**

**v.**

**ACRO TOOL & DIE WORKS and Alfred J. Farkas,[1] Defendants-Appellants.**

**No. 12091.**

United States Court of Appeals Seventh Circuit.

Dec. 16, 1957.

Rehearing Denied Jan. 13, 1958.

---

1. The record shows that Alfred J. Farkas was doing business as an individual proprietor under the name of Acro Tool & Die Works, and therefore there is but one defendant-appellant. Since the reference throughout the record was to "defendants-appellants" we shall use that form in this opinion in order to avoid confusion.

Clarence E. Threedy, Edward C. Threedy, Chicago, Ill., for defendants-appellants.

I. Irving Silverman, Louis Swidler, Myron C. Cass, Chicago, Ill., for plaintiffs-appellees.

Before LINDLEY, SCHNACKEN-BERG and HASTINGS, Circuit Judges.

HASTINGS, Circuit Judge.

This is an appeal from a judgment of the district court holding defendants guilty of civil contempt for continued infringement of two patents in violation of an injunction entered by that court on April 1, 1955 in a consent decree.

The plaintiffs below (appellees) were Kiwi Coders Corporation (hereinafter called Kiwi) and its president, James G. McKay, and the defendants below (appellants) were Alfred J. Farkas doing business as Acro Tool & Die Works (hereinafter called Acro). The cause in which the consent decree was entered will be referred to as the "original action" and was instituted by these plaintiffs herein against these same defendants. The original action and the instant contempt proceeding were both heard by the same trial judge.

The two patents involved were No. 2,562,627, an adjustable inking device with an inking wheel, and No. 2,634,676, a dating device for printing characters on moving packages, hereinafter to be designated as No. 627 and No. 676, respectively. The defendants' accused device in the contempt proceeding is known as Model 6000, and has an inking wheel and dating device. Claims 3 and 4 of No. 627 and Claims 1 and 3 of No. 676 are in issue.

The original action was filed August 22, 1951 and charged infringement of these two patents and proceeded for about four years during which time various pleadings, briefs and depositions of defendant, Farkas, were filed, and two pre-trial conferences were held. At the time of the entry of the consent decree the parties entered into a settlement agreement stipulating that plaintiffs' two patents were valid and infringed by defendants' device then accused, that an injunction enjoining further infringement would issue, that damages and profits arising out of the alleged infringement would be waived and that defendants would not manufacture or sell apparatus comprising infringements of these patents except under license or agreement from plaintiffs, but providing that defendants would be permitted to sell devices then on hand and make up devices out of parts then in stock for a period of six months but not later than October 1, 1955.

Pursuant to this agreement and stipulation a final judgment was entered in the original action with the written consent and agreement of all parties, waiving the right to any appeal, wherein it was decreed that the patents were valid, that the claims of the patents were infringed by defendants' accused devices, and further that defendants were enjoined from " * * * making, using and/or selling or offering for sale apparatus coming within the scope of the

said Letters Patent No. 2,562,627 and * * * 2,634,676." Subsequently, defendants began the manufacture and sale of their accused device Model 6000 and this became the subject of the instant petition for contempt of court for alleged violation of the foregoing injunction.

The ultimate contested issue is whether or not the district court erred in finding that defendants' accused Model 6000 infringed the claims in issue and in concluding therefrom that defendants were guilty of civil contempt of court for violation of the injunction in the original action.

Both patents relate to the construction of a device for automatically applying numbers to a moving line of packages by printing the numbers upon the packages. Such a device is customarily used to print on containers or wrappers information as to date, price, name, flavor, weight or other data, in code, leading to various controls of the packaged items by all of their handlers. Both patents evolved out of the same application. The first, No. 627, concerns an inking wheel one of whose objects, as set forth in the specification: " * * * is to provide a novel inking arrangement in which the rate of ink dispensation is readily adjustable; in which a large quantity of ink can be held in the roller of the inking device so that the same will operate for a long time without the need of adding ink; in which the pressure of the roller is easily adjusted and the roller itself capable of quick removal or replacement; and in which the printing type is clean at all times."

The second patent, No. 676, covers a revolving dating wheel which has among its objectives, as stated in the specification: " * * * to provide a device of the character described which will include a revolving dating wheel carrying all the possible combinations of numbers which can be used and same being adjustable in a simple and expeditious manner * * * and which same may be removably attached in a sturdy manner to any conveyor, wrapping machine, carton forming machine, or any other place where cartons, labels, boxes, or cases pass on a conveyor." The second patent is a division of the first, with the same original filing date of December 2, 1947, the division application having been filed on July 3, 1951, with exactly the same drawings in three sheets and much of the same textual description. Both are illustrated and described as parts of a single machine.

In the contempt proceeding the trial court had before it the pleadings; six briefs (three filed by each party); seven affidavits filed by plaintiffs; five affidavits filed by defendants; numerous exhibits, including an accused code dater Model 6000 manufactured by Acro, a disassembled numberer from such model, a commercial code dater manufactured by Kiwi, two models of defendants' inking wheel with a segment cut from one, (both parties used foam rubber for their inking wheels), a sectional model of defendants' dating device, various sectional drawings of the devices and some of their component parts, photographs, and reproductions of printed advertisements, trade journal articles and instruction sheets for use of the accused device; the settlement agreement in the original action; and reproductions of the original letters patent. The court heard no oral testimony and denied defendants' petition to take the depositions of plaintiff McKay and defendant Farkas. There were several hearings and oral arguments on the briefs and on various motions filed by defendants. The defendants' accused device in the original infringement action was not in evidence in the contempt proceeding.

The contempt petition was filed October 29, 1956 and was heard entirely on the documentary evidence outlined above by the court without a jury. On June 28, 1957 the court made its findings that slight differences between the accused device and the patented device "do not in fact represent such significant modification as to avoid infringe-

ment," and that defendants "are guilty of civil contempt of Court for deliberate violation of the injunction heretofore issued by making, using or causing to be used, and selling a code dater identified as Acro Code Dater, Model 6000, which is so constructed as to constitute a substantial equivalent and colorable imitation of the invention shown or illustrated in the aforesaid Letters Patent, and an infringement of the claims of said patents, and which is the equivalent and mere colorable variation, differing only in trivial detail, of the device previously adjudged to infringe."

The court rendered judgment on its findings and awarded plaintiffs the profits that defendants realized from their acts of infringement, together with compensation to plaintiffs for their expenses, costs and attorneys fees incident to bringing the contempt proceeding, and appointed a special master to ascertain the amounts comprising such award.

At the outset, we are called upon to determine whether defendants' accused Model 6000 did in fact infringe the claims of the two patents in issue. Resort must be had, therefore, to the claims themselves.

Claims 3 and 4 of No. 627 read as follows:

"3. In a device of the character described which is adapted to print indicia on packages moving past the same and which includes printing means; an inking device adapted to supply ink to said printing means comprising an absorbent foam rubber disc, cup members for holding said disc under compression with the peripheral edge of the disc exposed and adapted to contact and carry ink to said printing means, said cup members being mounted at their respective centers on a shaft adapted to rotate with the disc, means on the shaft for moving said cup members toward one another axially of the shaft thereby adjusting the compression of the foam rubber disc regulating the flow of ink from the center of the disc to the peripheral edge thereof.

"4. In a device for printing indicia upon a moving line of packages and which has a character-bearing printing member; an inking wheel for rolling ink upon the characters of the printing member which comprises a disc of highly absorbent, porous rubber of foamy cellular composition, thereby providing capillary passage for ink throughout the disc, a pair of juxtaposed pressure plates arranged with the said disc sandwiched therebetween under compression, and means for varying the spacing between the plates to adjust the compression and thereby adjust the rate at which ink will flow to the edge of the disc, said wheel having means for rotatably mounting the same."

In the drawings in evidence the patented inking wheel (No. 627) is shown to be a preferred embodiment of the structure. It describes a mounting shaft which carries a sleeve rotatable thereon, on which are mounted aligned bushings with their adjacent end portions substantially spaced from each other. Mounted on these bushings and movable therewith are cup members (side plates) between which is an absorbent foam rubber disc. By threading nuts on opposite ends of the sleeve against the bushings, the compression between the cup members and the rubber disc can be varied. The rubber disc carries the ink which can be fed to it through openings in the center of the cup members or it can be applied to the outer surface of the disc. Simply described there is a foam rubber disc impregnated with ink mounted on a revolving shaft so that as the disc turns its outer surface (peripheral edge) meets the type of the dating device revolving on another shaft thereby applying the ink to such type for printing purposes.

Appellants state in their brief that "[d]efendants' inking wheel, Model 6000, comprises all of the elements of claims 3 and 4 *with the exception* of means for

adjusting cup members toward one another axially on the shaft for regulating the flow of ink from the center of the foam rubber disc to the peripheral edge thereof." In the accused device, (a model and drawings of it being in evidence), we find that the inking wheel is almost identical with the one in the Kiwi device. The defendants substituted a wood bushing on which the disc is mounted between the side plates, which side plates are held firmly in abutment with the wood bushing by retainer nuts threaded against spacer collars bearing against the side plates. The result is that the side plates are held rigidly in place so as to securely clamp the rubber inking pad or disc between them. In the patented device the pressure against the sides of the disc can be readily varied by threading the nuts on opposite ends of the sleeve against the bushings. In the accused device the degree of compression remains fixed as determined by the length of the wood bushing and can only be varied by changing the length of this bushing.

Defendants contend their Model 6000 does not infringe Claims 3 and 4 of No. 627 because (1) its side plates serve only to stabilize the inking disc and cannot be adjusted relative to each other after being locked against the fixed wood bushing; (2) no means is provided for feeding ink to any portion of the disc between and beneath the side plates; (3) ink is applied only to the peripheral edge of the disc by means of a brush or the like; and (4) the ink does not flow from the center of the disc to the outer edge, and very little ink finds its way from the outer surface down to and within the area between or covered by the side plates.

However, it appears that in both the patented and accused devices the side plates are used to stabilize the disc and to compress its sides and thereby regulate the rate of ink flow by means of this exerted pressure. In the Kiwi model the adjustment of the pressure through the side plates is variable and in the Acro apparatus it remains fixed, and this would appear to be a trivial difference. For years plaintiffs have applied ink to the outer surface as do defendants. In fact, in the commercial model of the patented structure in evidence no openings for the introduction of ink into the cup members are provided. The discs in each instance are of foam rubber and serve to conduct the flow of ink by capillary action. Plaintiffs have been using wood bushings in their devices since 1950.

We now turn our attention to Claims 1 and 3 of No. 676 which read as follows:

"1. In a device of the character described, a printing wheel comprising a pair of discs having adjustable numberers positioned therebetween and circumferentially thereof with the printing edges of said numberers having their printing edges lying substantially upon the edge of said wheel and protruding slightly therebeyond whereby to print characters upon a surface against which said wheel is rolled, each numberer including a frame having continuous bands of printing characters extending over respective wheels and the bridge whereby by rotating the wheels a line of different characters may be positioned upon said bridge member, said bridge being curved to enable the line of characters substantially to follow the curvature of said wheel, and said friction wheels having means whereby certain of the bands may be revolved eccentrically with respect to the other to compensate for the curvature of said bridge."

"3. In a device of the character described, a printing wheel comprising a pair of discs having adjustable numberers positioned therebetween and circumferentially thereof with the printing edges of said numberers having their printing edges lying substantially upon the edge of said wheel and protruding slightly therebeyond whereby to print characters upon a surface against which said wheel is rolled, each numberer

including a frame having a plurality of friction wheels and a bridge member at opposite edges thereof and having continuous bands of printing characters extending over respective wheels and the bridge whereby by rotating the wheels a line of different characters may be positioned upon said bridge member, said bridge being curved to enable the line of characters substantially to follow the curvature of said wheel, and said numberers having means whereby certain of the bands may be revolved eccentrically with respect to the other to compensate for the curvature of said bridge."

No. 676 relates to a device for printing characters on moving packages, and in so far as the claims in issue are concerned such device includes a printing wheel. The novelty of the invention lies in taking a conventional numbering device (similar to those in common use wherein characters on rubber bands are rotated over the narrow end of the numberer) and disposing of a plurality of these about a wheel with their printing characters protruding beyond the circumferential edge of the wheel. Since the wheel was to roll the characters upon a passing carton, the characters had to present a curved surface to the carton. To solve this problem the inventor constructed the numberers with a curved bridge and caused the rubber character bands to pass over the bridge. He contemplated some means to compensate for the variation of distance between the axis of the friction wheels and the various levels relative thereto at which the characters had to be presented to the edge of the wheel. The preferred expedient was to enlarge the bearing holds of the center friction wheels, "thereby compensating for the difference in distance above referred to," in order that the bands all be under substantially uniform tension.

Defendants agree that Claim 3 is substantially the same as Claim 1 except that in Claim 3 it is stated that the means whereby certain of the bands may be revolved eccentrically with respect to the other to compensate for the curvature of the bridge (over which the revolving rubber bands pass in order to present the characters to the printing surface) is provided by the "numberers," whereas in Claim 1 it is stated that such means is provided by the "friction wheels."

The accused device Model 6000 includes the elements of each of Claims 1 and 3, viz.: a frame, a plurality of friction wheels, a curved bridge member, and continuous bands of printing characters. Defendants claim to omit therefrom the means provided by the friction wheels (Claim 1) or by the numberers (Claim 3) whereby the bands are rotated or revolved eccentrically with respect to each other. They claim to accomplish this by mounting the friction wheels of their Model 6000 concentrically on their supporting shaft. In mounting the rubber tapes over the friction wheels and curved bridge plate they utilize the natural stretchability of the bands to compensate for the variation of the distance between the shaft and the curved surface of the bridge plate. This, they assert, was never contemplated in the specification of No. 676.

The trial court considered defendants' argument and concluded there was infringement. The evidence discloses to our satisfaction that the complete organization of parts and elements called for by the claims of No. 676 is found in the accused Model 6000, and that these parts and elements perform in the manner contemplated by the patentee. The patentee in describing his preferred embodiment did not limit himself but felt that this method was the most efficient. Appellees aptly point out that other structures were contemplated by patentee when he stated in his patent specification that "[b]y my construction, the necessity of providing special wheels, shafts or *tapes* is eliminated without loss of operating efficiency." (Emphasis supplied.)

■ We conclude, therefore, that the evidence clearly sustains the finding of the court below that the slight differ-

ences in the inking wheel and numbering device in defendants' Model 6000 do not in fact represent such significant modification as to avoid infringement.

 Since the evidence in this case is all either documentary or in the form of physical exhibits, we are in as good a position as the trial court to examine it and determine for ourselves whether or not there is infringement of the patent claims in issue. Under these circumstances "the findings of the District Court are deprived of the degree of finality which would otherwise attach under Rule 52." Steiner v. Mitchell, 6 Cir., 1954, 215 F.2d 171, 175. See also Falkenberg v. Golding, 7 Cir., 1952, 195 F.2d 482, 486; Lewyt Corporation v. Health-Mor, Inc., 7 Cir., 1950, 181 F.2d 855, 857 certiorari denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 1949, 178 F.2d 794, 802, certiorari denied 339 U.S. 915, 70 S.Ct. 575, 94 L.Ed. 1340. We have examined the evidence and hold, as did the trial court that the accused Acro Code Dater, Model 6000, is so constructed as to constitute a substantial equivalent and colorable imitation of the plaintiffs' patented device, and an infringement of the claims of said patents. As the Supreme Court said in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097, " * * * to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. * * * One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book, or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement." In this opinion the Court goes on to point out that the doctrine of equivalents evolved in response to this type of infringement and reiterates (339 U.S. at page 608, 70 S.Ct. at page 856) that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape."

 This being a contempt proceeding for the alleged violation of an injunction entered in a consent decree in the original action the validity of the patent claims is not in issue. They were determined to be valid in that decree and that question is *res judicata* in this case. A consent decree is a judicial act, United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, with the same force and character, therefore, as a judgment rendered following a contested trial.

 Appellants admitted infringement in the original action and were permitted to go without the payment of damages, profits, costs and disbursements, but under the injunction to refrain from "making, using and/or selling or offering for sale apparatus coming within the scope of the claims of said Letters Patent * * *." In entering again upon the manufacture and sale of devices that might come within the scope of the claims previously held valid, appellants were operating at their peril. Having been enjoined generally from further infringement, it was incumbent on appellants to exercise care in avoiding further infringement, and where they shortly enter upon another practice which the court holds also infringes, they are guilty of a real contempt of court. Blair v. Jeannette-McKee Glass Works, 3 Cir., 1908, 161 F. 355, 358, and National Rejectors v. A. B. T. Mfg. Corp., 7 Cir., 1951, 188 F.2d 706, 710.

Appellants further complain of the trial court's finding that its Model 6000 "is the equivalent and mere colorable variation, differing only in trivial detail, of the device previously adjudged to infringe," because it did not have before it a physical specimen of such prior device. This becomes unimportant since we have held that Model 6000 does infringe. It is also significant that the same trial judge heard the original action and the contempt proceeding and

we cannot say that he did not have the prior device in mind.

Since we are of the opinion that the evidence conclusively demonstrates that appellants' accused device continues the prohibited infringement, the trial court did not err in its conclusion that appellants were guilty of civil contempt of court.

The judgment is

Affirmed.