**JOHN R. THOMPSON CO.,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 72–1076.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1973.

Decided April 20, 1973.

William A. Cromartie, Chicago, Ill., for plaintiff-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chica-

go, Ill., Scott P. Crampton, Asst. Atty. Gen., James H. Bozarth, Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant-appellee.

Before HASTINGS, Senior Circuit Judge, and KILEY and PELL, Circuit Judges.

HASTINGS, Senior Circuit Judge.

Plaintiff John R. Thompson Co. is a corporate restaurateur. The present appeal involves its 1959 federal income tax liability, but plaintiff's dispute with the United States centers on events which occurred in 1962. As well as owning other restaurants and restaurant chains, plaintiff owned and operated Henrici's Restaurant on West Randolph Street in Chicago's Loop area. A salient feature of this restaurant's Victorian decor and flavor was the presence on its walls of 42 oil paintings, engravings and prints, most of which dated from the nineteenth century. Plaintiff purchased these works of art in 1929 as part of the transaction by which it acquired the restaurant. The paintings had been collected by the restaurant's previous owners for over twenty years prior to the transaction, and they were used continuously after their initial acquisition to decorate the restaurant's walls.

The City of Chicago condemned plaintiff's leasehold interest in the restaurant premises in 1962, preparatory to erecting the Chicago Civic Center on the site, and plaintiff was forced to close the restaurant. It is plaintiff's contention that the condemnation and resultant forced closing of the restaurant in 1962 caused it to suffer a loss because of the decline in value of the collection of paintings occasioned thereby. Plaintiff alleges that, since the paintings had been utilized in the operation of its trade or business, the loss could be taken under one or the other of §§ 165(a) and 167 of the Internal Revenue Code of 1954. Of necessity, plaintiff's contention must be regarded as being in the alternative because § 165(a), nondepreciable property, and § 167, depreciable property, are mutually exclusive.

Plaintiff's 1962 income tax return showed a consolidated net operating loss, which plaintiff used as a net operating loss carryback to 1959, pursuant to § 172 of the Code. Part of the 1962 net operating loss was the loss plaintiff claimed on the paintings. On plaintiff's application under § 6411 of the Code, the Commissioner of Internal Revenue allowed a tentative carryback adjustment and made a 1959 income tax refund to plaintiff. Thereafter, following an audit of plaintiff's 1962 return, the Commissioner disallowed the loss for the paintings, adjusted the 1962 net operating loss accordingly and asserted a deficiency for 1959. Plaintiff paid the deficiency assessment and then filed a claim for refund with the District Director of Internal Revenue in Chicago, pursuant to Treas.Reg. § 301.6402–2(a)(2). The claim was disallowed.[1] Plaintiff brought this action against the United States to enforce its claim for refund and, ultimately, to vindicate its alleged right to take a 1962 loss deduction on the paintings. The district court, which had jurisdiction of the action under 28 U.S.C.A. § 1346(a)(1), held that plaintiff did not experience a loss in 1962 under either of the claimed sections of the Code. The court entered judgment for the United States, D.C., 338 F.Supp. 770 (1971), and we affirm.

Section 165(a) of the Code provides a deduction from income for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." It has been stipulated that plaintiff was not insured against its "loss" on the paintings and that it made no claim for compensation for such a loss as part of the condemnation award. A

---

1. By the operation of § 6511 of the Code, the claim was only partially timely. As to the timely portion of the claim, however, the filing of the claim fulfilled the requirements of § 7422 of the Code.

Treasury regulation defines the nature of the loss allowable under § 165(a):

> "To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." Treas.Reg. § 1.165–1(b).

Plaintiff contends that its alleged loss is further governed by Treas.Reg. § 1.-165–2(a):

> "A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property occurs."

██ The record in this case consists solely of the pleadings, a stipulation by the parties with attached exhibits and the depositions of two of plaintiff's former employees. "Since the evidence in this case is all either documentary or in the form of physical exhibits, we are in as good a position as the trial court to examine it and determine for ourselves" the facts of this case. "Under these circumstances 'the findings of the District Court are deprived of the degree of finality which would otherwise attach under Rule 52 [, Federal Rules of Civil Procedure, Title 28, U.S.C.A.].'" Kiwi Coders Corp. v. Acro Tool & Die Works, 7 Cir., 250 F.2d 562, 568 (1957), quoting (in part) Steiner v. Mitchell, 6

Cir., 215 F.2d 171, 175 (1954), aff'd, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956). Our independent examination of the record leads us to two basic conclusions. (1) As a matter of law, plaintiff's alleged loss in 1962 could not have been as great as it claims; the measure of loss for which it contends is wholly unsupportable. (2) As to that part of the alleged loss which plaintiff may, in fact, have sustained in 1962, there has been a failure of proof. Since the burden is on the taxpayer to prove the deductibility of the loss it claims,[2] plaintiff cannot prevail.

█ In 1929, plaintiff paid $184,699 for the paintings in issue. In 1962, their value in the art market was appraised at $44,150. Plaintiff would deduct the entire $140,549 difference between these two sums as a 1962 loss. Under no tenable theory was this entire amount a "loss incurred in a business," as required by Treas.Reg. § 1.165–2(a), *supra*. Some part of the difference between 1929 purchase price and 1962 appraisal value may be attributable to a decline in the popularity of these paintings among the art-buying public. Plaintiff would have suffered this portion of the loss regardless of whether the paintings were hanging in the restaurant, in an art gallery or elsewhere. The mere fact that an art owner chooses to display his collection in his place of business, for whatever reason, does not transform a loss incurred in the art market into a loss incurred in the business. *Cf.* A.R.R. 4530, II-2 Cum.Bull. 145 (1923), superseded by Rev.Rul. 68–232, 1968–1 Cum.Bull. 79. The phrase "incurred in a business" in the regulation cited above describes the manner of incurrence, not the place of incurrence. Furthermore, plaintiff has presented no evidence that the portion of the loss attributable to the decline in art market value was "actually sustained during the taxable year" 1962, as required by Treas.Reg. § 1.165–1(b), *supra*. Since

---

2. Landerman v. Commissioner, 7 Cir., 454 F.2d 338, 341 (1971), cert. denied, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972).

the value of the paintings in the art market may have continued to fluctuate during 1962, 1963 and 1964, while plaintiff held the paintings, no reason is apparent why this case should not come under the general rule [3] that fluctuations in the value of property are not recognized as gains or losses until "closed and completed transactions, fixed by identifiable events," occur. Treas. Reg. § 1.165–1(b), *supra*. In this case, we find no transaction prior to the 1964 sale of the paintings which caused plaintiff to realize a loss on the art market value of the paintings.

■ Over and above their value in the art market, the paintings had an additional (and not inconsequential) value because of their use in plaintiff's restaurant. This is clear from the 1971 deposition testimony of plaintiff's former president and of the restaurant's former manager. It is also clear that this additional value was a factor in the price plaintiff paid for the paintings in 1929. As such, its "basis" is ascertainable by subtracting the 1929 art market value of the paintings from the $184,699 purchase price. Unlike the loss in art market value for which plaintiff claimed a 1962 deduction, which we have held was barred as a matter of law, it is entirely possible that plaintiff suffered a 1962 loss on this additional value. Such a loss, if it occurred, would have been incurred by plaintiff "in a business," for reasons having no connection with the art market, but dependent wholly upon the fortunes of plaintiff's business.

■ Whatever the possibilities, we must agree with the district court that plaintiff failed to prove such loss in additional value. Plaintiff's most telling failure was in not proving that a "closed and completed transaction" occurred in 1962, "fixed by [an] identifiable event." Although the condemnation forced plain-

tiff to close the restaurant on August 15 of that year, a strong inference remains in the record that the usefulness of the paintings in plaintiff's business did not terminate on that date and that the paintings were not "permanently discarded from use" at that time. On the contrary, plaintiff considered reestablishing the restaurant, with the identical decor, at some other location in the Loop. As an alternative, it also considered trying to recreate the restaurant's atmosphere, by means including the use of the paintings, at one of the twelve other restaurants it owned and operated under the Henrici's name. Thus, in response to the question why plaintiff did not eventually move the restaurant to another location within the Loop, plaintiff's former president answered:

"Well, frankly, because we couldn't find a location we liked and, particularly, the size of the room was very very important. To get that size room, the rent would have been almost prohibitive. So, after spending quite a little time looking over the various possibilities around the Loop, why, we finally give up."

The restaurant's former manager, when asked what his position had been with respect to relocation of the restaurant within the Loop, answered to the same effect:

"Well, in the first place, the square footage there was so much more than you could get in another building. This was one of the main stumbling blocks. In other words, there are many locations that became available, but most of the square footage that was offered was not adequate to take and to duplicate the Original Henrici's."

Finally, the former manager was asked, with respect to other restaurants plaintiff owned, "[D]id you consider the pos-

3. *See* United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). *See also* Hort v. Commissioner, 313 U.S. 28, 33, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); Weiss v. Wiener, 279 U.S. 333, 335, 49 S.Ct. 337, 73 L.Ed. 720 (1929).

sibility of using any of these paintings from the Randolph Street location?" He replied:

"Well, we would have liked to have done it, yes. It would have been advantageous, particularly, at Oak Brook and O'Hare, where we made some effort to duplicate the Henrici's. In fact, trying to capture the Victorian type era that we discussed previously.

"It would have been very advantageous, certainly, to have been able to transport these particular operations, because they were in the same general location, and Oak Brook and O'Hare caters to many of the same customers who are still customers of ours."

A further indication of plaintiff's intentions is found in a newspaper article attached to the parties' stipulation as Exhibit 5. The article bears the date of August 9, 1962, six days before the restaurant closed. Short excerpts follow:

"Chicago's new $76,000,000 Civic Center will rise on the site by 1965. A spokesman for Henrici's said this week 'it is likely' that the restaurant will reappear in the Civic Center, but no contract has yet been signed.

\* \* \* \* \* \*

"Some of that flavorful Gay '90s decor will be salvaged before the Loop restaurant is abandoned to the wreckers. To be saved are the familiar 11½ foot grandfather's clock, woodwork, some lighting fixtures, plaster wall disks and about 35 oil paintings, including the one of Niagara Falls that decorates the wall behind the cashier.

"These objects will be saved for future use in the new Henrici's in the Loop."

To overcome the inference created by this evidence, plaintiff relies on a single sentence in the parties' stipulation: "From the time of the condemnation in 1962, until October 18, 1964 [the date the paintings were sold at auction], plaintiff held the paintings for disposition in the most profitable (or least unprofitable, as the case may be) manner possible." Bearing in mind that plaintiff had the burden of proof in this matter, this sentence standing alone does not carry conviction that by August 15, 1962, plaintiff had abandoned all intention of using the paintings elsewhere within its corporate restaurant business. "Disposition," as used in the stipulation, fails to overcome the impression created by the other evidence that, until it reached a specific decision at some unknown time before October 1964 to sell the paintings at auction, plaintiff had among its options the continued use of the paintings elsewhere within its business. Continued use of the paintings within its business might have turned out to be the "most profitable" disposition plaintiff could make of the paintings. The condemnation and forced closing of the West Randolph Street restaurant would not then have been the "closed and completed transaction" required by the regulations. Likewise, the ultimate corporate decision to sell the paintings at auction has not been "fixed by [an] identifiable event" as having occurred in 1962. For these reasons, plaintiff has failed to prove its right to a 1962 loss deduction on the additional value of the paintings under § 165(a) of the Code.

Plaintiff's claim under § 167 gives us no difficulty. The loss deduction allowed under that section of the Code is for depreciable property only. Except to the extent that they are subject to physical decay (and the parties have stipulated that the physical condition of the paintings in 1962 was "not significantly different from their condition at the time the paintings were acquired in 1929"), works of art are not depreciable. The district court dealt with this question more than adequately, and we adopt that portion of its opinion which discusses plaintiff's claim under § 167. 338 F.Supp. at 777–779.

Underlying the present dispute is another disagreement between the parties as to the character of the paintings for tax purposes. Are they business assets, which give rise to fully deductible ordi-

nary losses? Or are they capital assets, which give rise to capital losses deductible only to the extent provided in §§ 1211 and 1212 of the Code? Since we affirm the district court's decision denying plaintiff a 1962 loss deduction, we have no occasion to characterize the paintings in these terms or to determine the nature of the deduction plaintiff may claim in the year, if any, in which it proves its loss. We express no view on the merits of this underlying dispute.

For the foregoing reasons, the judgment of the district court is affirmed.

Affirmed.

PELL, Circuit Judge (dissenting).

The only issue presented on this appeal is whether the appellant sustained a loss in 1962 deductible from ordinary income on its income tax under either § 165(a) or § 167 of the Internal Revenue Code. The holding of the majority opinion is that it did not. I respectfully dissent.

While the paintings were not sold until 1964, in my opinion the loss was sustained when the taxpayer's unique restaurant business on Randolph Street, Chicago, was permanently closed by virtue of condemnation.

Looking at Treasury Regulation § 1.-165–2(a) it appears to me that a "loss [was] incurred in a business . . . and arising from the sudden termination of the usefulness in such business . . . of . . . nondepreciable property, in a case where such business . . . is discontinued [and] where such property is permanently discarded from use therein . . . ." In such a case the Regulation provides that the loss shall be allowed as a deduction under § 165(a) for the taxable year in which the loss was actually sustained.

Under Treasury Regulation § 1.165–1(b), the loss was evidenced by the closed and completed transaction of the restaurant doors being permanently and irrevocably closed by the identifiable event of the condemnation. I do not conceive there could have been a viable contrary argument if the sale of the paintings had occurred immediately; however, the hope, and it was at most only that, that this traditional Loop restaurant, almost an institution, might once again engage in business was foreclosed by economic facts of life, all of which were in existence and applicable in 1962, irrespective of whether completely recognized by that human characteristic which "springs eternal." The death knell was sounded in 1962 and any subsequent tolling was merely a corroborative requiem.

Although I do not conceive that it was necessary for the ultimate holding in the majority opinion, a part of that opinion is devoted to the necessity for allocating some part of the total dollar figures involved between paintings as art objects and paintings as an essential part of the decor of the restaurant. I did not understand that the Government made any such contention and certainly the taxpayer did not. In candor, I do not follow the line of reasoning in this part of the majority opinion. Any nondepreciable property utilized exclusively in connection with a business may have separate intrinsic value. But if X dollars are paid for such property on acquisition, that would appear to me to be the cost basis under the Code, and if at the time of the loss, here assumed *arguendo*, the fair market value is X–Y dollars, I fail to conceive why the loss (Y dollars) was not incurred in a business, where the property was used exclusively in the business, irrespective of an identifiable, separate intrinsic value of the property.

The majority opinion adverts to an underlying dispute as to whether the paintings were business or capital assets. The differentiation has a substantial tax impact. I entertain a sneaking suspicion that if the paintings had sold for a substantially greater sum than their cost the parties would have been equally vigorous in their disagreement, but supporting the opposite views to those presently entertained. Such seems to be the course of tax litigation.

Being of the opinion that the loss was final and irrevocable in 1962, 5 Mertens, Law of Federal Income Taxation § 28.-15, I have recorded this dissent.