**INMATES OF the BOYS' TRAINING SCHOOL**

v.

**Bradford E. SOUTHWORTH et al.**

**Civ. A. No. 4529.**

United States District Court,
D. Rhode Island.

Aug. 9, 1977.

Jean Musiker, of R.I. Legal Services, Pawtucket, R.I., Richard P. D'Addario, Newport, R.I., for plaintiff.

Forrest L. Avila, Sp. Asst. Atty. Gen., Providence, R.I., Valentino D. Lombardi, Legal Counsel, Dept. of Corrections, Providence, R.I., for defendants.

## OPINION

PETTINE, Chief Judge.

This action seeks injunctive relief against defendants for failure to fully implement consent orders entered on April 19, 1973 and June 19, 1973, setting minimum standards for the rehabilitative treatment of juveniles confined to the Youth Corrections Center (YCC), a segregated, fenced-in area within the Boys' Training School (BTS), a state institution in Cranston, Rhode Island. The decrees were entered following a hearing for a preliminary injunction, wherein the Court ordered the parties to submit appropriate plans for its approval. The parties negotiated a compromise, submitted the April 19 and June 19 orders to the Court to be entered by agreement, and thus avoided a final hearing on the merits for a

permanent injunction. *See Inmates of the Boys' Training School v. Affleck,* 346 F.Supp. 1354 (D.R.I.1972).

In spite of the condition of settlement that all aspects of the consent order be complied with by January 1, 1974, and in spite of the repeated attempts by counsel for the plaintiffs to obtain compliance through a cooperative effort, the juveniles in question continue to be deprived of those programs to which they are entitled.

Thirteen separate violations are alleged by the plaintiffs, each of which requires a review of the evidence and findings of fact by the Court; this will be done under the appropriate heading of the particular complaint.

### A. Lack of Psychiatric and Psychological Services [1]

The Plan approved by the Court requires that each resident of the YCC be screened by a psychiatrist within 48 hours of admission and that each resident of the BTS be screened within 7 days of admission; and that within 21 days an interdisciplinary team, including the psychologist, meet and develop an individualized Treatment Plan for that resident, to be reviewed monthly. The Plan also provides for a psychiatric review of the status of all residents of the YCC on a weekly basis and further that the psychiatrist and a psychologist assist with staff training and program development.

Of all the requirements set forth in the Plan none hold the same position of importance as this one. Nevertheless, the record evidences an almost apathetic attitude on the part of management, toward this crucial component of the plan approved by the Court.

Dr. Leo Carroll conducted a study of the Training School in June 1974. He examined twenty files at random and found that less than half had individual treatment plans established.

---

1. *See* Sections VI, VII and VIII of the Comprehensive Classification and Treatment Plan for the Rhode Island Training School for Boys and Youths Correction Center, approved by paragraph 1 of the June 19, 1973 Order of this Court.

In July of 1976 another survey of the files was made, and it revealed that in the majority of cases there were no psychiatric and psychological examinations; that of the thirty-three boys at the Training School only one-third had psychiatric examinations though they had been admitted to the School a total of eighty-five times. Each admission mandated a separate psychiatric and psychological examination; however, only eleven psychiatrics and twenty-two psychologicals were completed; and on less than one-fourth was an Individual Treatment Plan established, setting forth, as required by the Comprehensive Classification and Treatment Plan, the clinical needs, problems and personality of the resident, the rationale and intermediate and long range goals of the treatment, a description of the daily program and activities, and the date on which the interdisciplinary team was to meet and review the program.

The following cases are illustrative of the shortcomings of the psychiatric evaluation program. A fourteen-year-old boy admitted in December of 1973 on a murder charge was not referred to a psychiatrist for examination until eight months after admission and even then was not examined, though recommendations made by the psychologist could not be followed until the psychiatric was completed. The psychologist finally referred him to an outside agency so that sessions could be initiated on an ongoing basis in the community with a psychiatrist. Another sixteen-year-old was admitted to the Training School on February 20, 1975 and as of March 3, 1977 had not been seen by a psychiatrist. The result of such omissions is that comprehensive planning for such youngsters cannot be effectuated.

As part of the general malaise, the evidence also proves a failure to make weekly reviews as required by the order. The order requires that "[a]t least once each week, the qualified psychiatrist responsible for the unit, the residents' assigned social worker and other appropriate personnel shall meet with the superintendent or assistant superintendent and review the progress of each resident confined in the Youth Correctional Center . . ."

The defendants' reply does not directly confront the failures pointed out in plaintiffs' case. They answer the single accusation of the fourteen-year-old boy by merely saying he was referred to a Health Clinic. In stating this they omit to note that this was done by the psychologist in apparent desperation, after the boy failed to receive the psychiatric help he needed at the Center. Furthermore, defendants ignore the fact that the Plan required development of individual treatment by an interdisciplinary team with psychiatric help where appropriate. It was shown that the psychiatrist employed by the state was not available as needed.

Defendants further respond by saying the Court decree was disregarded because the "professional in charge" should decide what tests ought to be given each individual. The Court sees this as a rather bare faced statement oblivious to the fact the defendants consented to the decree. This same attitude of self-determination as to whether the defendants would follow the Court order is evident in the argument they make that the time limits for psychological evaluations are unrealistic. In 1973 they agreed to the order and at no time have they ever moved for a change of that part of the decree.

As to the defendants' failure to have weekly meetings as described in the order, they merely reply that they do have weekly meetings. True, but the evidence shows the superintendent and the psychiatrist are not present at these meetings and that up to three months after the filing of the plaintiffs' motion in this case they were informal and undocumented. Furthermore, they do not consider, as is required, the right of the youth to participate in vocational and physical educational instruction.

The defendants also argue that budgetary constraints prevented the hiring of the necessary personnel to support the positions mentioned in the Court's orders and thus make compliance possible. Defendant Southworth states that as Director of the

Department of Corrections his sphere of influence is restricted to mere recommendations of positions to be funded, that the ultimate authority is in the legislature, and that the failure of the state to follow his recommendations for funds has imposed strictures. The implication of this argument is that he is not to blame for the present inadequacies in the psychiatric and psychological programs of the YCC.

 The force of the defendants' economic plight may be one of the realities of life, but their leadership in this regard was less than enthusiastic. The record shows that only in fiscal year 1973 did defendants even attempt to include in the budget a position for psychologist. In addition it is admitted that from the present budget money can be used to hire the necessary staff, but defendants offer no evidence that this will be done. At any rate, budgetary constraints are not relevant to the issues before this Court. Absent any request for modification of the decree monetary considerations are irrelevant where constitutional rights are at stake.[2]

The Training School still lacks the staff required by the Order. There is no full-time clinical psychologist. There is no individual whose job classification is that of a psychologist or who is performing the duties of a psychologist as set forth in the Comprehensive Classification and Treatment Plan. Furthermore, the Plan calls for

six full-time clinical social workers. At the present time, there are four individuals with masters level degrees (one in psychology, one in sociology, one in educational psychology, and one in social work) employed full time as social workers. The parties have stipulated and the Court agrees that though the qualifications do not conform to the requirements set forth in the Plan, they are, nevertheless, acceptable. Finally, the order requires a qualified psychiatrist, though it does not specifically state this is to be a full-time position. At the present time, there is no individual who performs the duties of the required psychiatrist, nor do the defendants have access to a psychiatrist who is available to perform these duties. The availability of the psychiatrist is far from satisfactory.

The end result is there is no treatment team as required by Section IV of the Comprehensive Classification and Treatment Plan.

### B. *Lack of Vocational Programs*

Just as shocking as the lack of adequate psychiatric care is the fact that no opportunities are afforded the plaintiffs to participate in vocational programs required by the Court's order. As the plaintiffs point out, in February of 1973, the defendants submitted to this Court a Comprehensive Academic Vocational Plan providing that individuals from the YCC "will be allowed to

---

**2.** *Watson v. City of Memphis,* 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529 (1963) (inadequate budget to integrate playgrounds and parks) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny them than to afford them."); *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir. 1972) (defendants' good faith not relevant to claim for equitable relief) ("As the court said in *Holt v. Sarver,* E.D.Ark., 1970, 309 F.Supp. 362, 385, aff'd 8 Cir., 442 F.2d 304, 'The obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish.' The result, not the specific intent is what matters . . . 'Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations.'

*Jackson v. Bishop,* 8 Cir., 1968, 404 F.2d 571, 580 (Blackmun, J.)"). *See also Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974); *Inmates of Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196 (1st Cir. 1974); *Hamilton v. Love,* 328 F.Supp. 1182 (E.D.Ark.1971).

The Court is aware that, because a consent decree was entered, there was no final adjudication on the merits of plaintiffs' constitutional claim. However, the probability that they would have succeeded in establishing the violation of a constitutional right was great, *see Inmates,* 346 F.Supp. at 1363–74 and cases cited at page 125 of this opinion. In any case, lack of funds cannot excuse non-compliance with the consent decree, for that document is as binding on the parties as a final adjudication on the merits would have been. *Kiwi Coders Corp. v. Acro Tool & Die Works,* 250 F.2d 562, 568 (7th Cir. 1959).

use the educational facilities outside the confined units" and that special arrangements "will be made for vocational instruction and actual experience in a special room in the Youth Correctional Center". This plan was ordered implemented on June 19, 1973. To date there has been no compliance.

There is a Youth Career Education Center for the Boys' Training School, but this is not made available to those confined at the YCC. The basic shop program at the YCC is substantially less than the vocational program available at the BTC. The failure to comply with the order that the educational facilities outside the confined unit would be made available is again defended behind the shield of security risk. The insistence on this excuse, which has apparently germinated since the entry of the Court's decree, has a mythical character because the defendants fail to substantiate it with evidence. If there is a security risk why have defendants not at some point come forward and urged this Court to modify its decree? Even during the substantial period during which the present motion was *sub judice,* they have not offered an iota of evidence substantiating this position. I cannot permit such cavalier conduct toward an order of this Court to continue.

The programs offered at the YCC are at best "vocational type", or more precisely, "prevocational". This complies with neither the spirit or letter of the Court's order; and it is no defense, as the defendants contend, that those admitted to the YCC do not stay there long enough to learn a trade. This is an unfortunate negative approach. The challenge should be to attempt planting a seed of interest in a young mind that, in spite of its deviations, is fertile enough to warrant the effort. Certainly no trade could be taught, but surely, the defendants

must be faulted for doing nothing when there was something they could do.

Now, three years after the entry of the final consent decrees, Ms. D'Amario advises the Court that the deficiencies of the Vocational program are being corrected, in that a structure for vocational facilities is being planned, although she cannot say it will meet the requirements of the consent decree.

### C. *Isolation and Segregation*

■ Through the single efforts of Ms. D'Amario, Assistant Director of the School, this violation of the order has been cured. Nevertheless, for over two years a lock-up process was permitted to exist and was not terminated until six weeks after the plaintiffs filed the present motion.

The residents of the YCC were divided into two groups. On a two-hour rotating seven-day-a-week basis one group was locked in their rooms while the other was permitted to move freely within the YCC building. The order of this Court provides that no resident shall be involuntarily locked alone for more than six hours in any calendar week; further, each resident is to be offered a full day of activities and programs.

The arbitrary practice of locking up a young offender for a two-hour period during the day demoralizes the individual and thus frustrates desired rehabilitative goals. Such a practice serves no treatment purposes. Instead it inhibits emotional development by accentuating a convict-like atmosphere. .

Such an unwarranted and long term violation of the order should be enjoined to prevent a reinstitution of the same practice.[3]

---

**3.** The plaintiffs concede that defendants "offered proof that they have hired staff to function as social workers . . . [and] have instituted a disciplinary board to decide questions of inmate infractions of the rules and to mete out punishment to youths confined to the Youth Correctional Center" (Pl. brief p. 31). However, they rightfully argue they are, nevertheless, entitled to injunctive relief. The de-

fendants have conceded the grant under which the social workers are paid will expire this summer. Furthermore, it took the plaintiffs' motion now under consideration to jog the defendants into action. *See Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 806, 9 L.Ed.2d 821 (1963) (". . . the voluntary abandonment of a practice does not relieve a court of adjudicating its legality, particularly where the prac-

### D. *Disciplinary Lock-Ups*

The evil of this practice was exposed, with all its resulting harm, in the trial of *Inmates of the Boys' Training School v. Affleck, supra.* It is entirely appropriate to repeat the testimony of certain experts quoted in that opinion.

> My experience in penology led me to conclude that isolation can never constitute rehabilitation. No doubt, when a person is out of control, terribly upset, and could conceivably be a danger to himself, or to someone else, he may have to be separated from others for a short while in order to calm down. . . . If isolation is continued beyond a short time, the person isolated may begin to experience sensory deprivation, withdrawal, or perhaps psychotic or autistic behavior. [Dr. Jerome Miller, Commissioner, Department of Youth Services for the Commonwealth of Massachusetts].

> It is my professional opinion that confining a child in isolation for punishment serves no treatment purpose whatsoever. On the contrary, because the child's problem or problems are in no way being dealt with during the period in which he is confined in isolation, the child's behavior deteriorates rather than improves in the course of his isolation. The isolation of a child only inhibits that child's emotional development. [Dr. George Lynn Hardman, Staff Psychiatrist, Roxbury Court Clinic, Boston; consultant to the Massachusetts Department of Youth Services].

346 F.Supp. at 1366.

The end result of such expert testimony and the facts developed in the *Inmates of the Boys' Training School* trial is that portion of the present order which requires the defendants to promulgate regulations forbidding the locking alone of any BTS or YCC resident in his room for more than six hours a week, and requiring that, during any lock-up, a mental health professional visit the resident if the time exceeds two hours and that, in all cases, a staff member observe the resident at regular 15 minute intervals.

The testimony in this case developed repeated violations of this order for more than two and a half years after it was entered. Disciplinary sanctions of confinement to rooms ranged from 24 hours to 14 days; except for a forty-five minute recreation period outside in handcuffs and a daily visit by a psychologist, "they are entirely segregated from the population and have no conversation, no social intercourse of any kind with anyone". (Tr. March 1, p. 24). The youths subject to these disciplinary measures are between 13 and 17 years of age.

The defendants offer in mitigation that "[d]uring confinement youths are given reading material. They are given exercise and a cigarette break; during week days confined youths are seen daily by a treatment person. These treatment personnel sometimes remove a youth from his room and bring him into the office and talk with him. On some occasions a youth is allowed to call home and talk with his parents. At times visiting rights are suspended. Music is piped into the room if the youth wishes to listen. It is impossible and unreasonable to limit confinement to a period of six hours or less". (Defendants' brief at 14).

▮ It is this Court's opinion that the defendants cannot take refuge behind such a recitation of facts. What is argued in certain instances may have transpired but the fact remains the pattern of violating the Court's order is unmistakable; in 1973 the defendants agreed not to confine a youth for more than six hours in any calendar week and if confined to adhere to certain specific procedures. This Court was never asked to modify its decree; defendants had no right arbitrarily to set up their own procedures.

Finally the defendants argue that under the Court's order a youth could be confined

---

tice is deeply rooted and long standing.") *See also U. S. v. W. T. Grant*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("The court's power to grant injunctive relief survives the discontinuance of the illegal conduct.")

to a control cottage for a period of 21 days after a disciplinary hearing; that when the control cottage was closed "it became the interpretation of the Department that a youth could be confined to his room for a period of 21 days as a substitute . . .".

■ I find no evidence of any such interpretation by the Department of Corrections in this record, and, if a substitute for the control cottage had to be found when it was closed no motion for modification of the Court's order was ever filed. Accordingly the injunctive relief sought by plaintiffs to remedy that abuse will be ordered.

### E. *Lack of Physical Education*

Paragraph 6 of the April 19, 1973 order requires at least four hours daily of physical education instruction; individual instruction to residents in areas of their interest; two hours of organized physical education outdoors, weather permitting, or two hours at the gymnasium including an opportunity to swim.

The evidence indicates there is no strict compliance with this provision of the order. Indeed, testimony was introduced showing that on certain days in November of 1976 the residents were not allowed outdoor exercises though the weather permitted such activity and that in January of 1977 they did not go outside for recreational purposes at all. The defendants admit that youths do not stay outside for at least two hours a day on a regular basis but point out that an instructor comes into the YCC Monday through Friday from 9–10 a. m.

The testimony further showed that four hours of physical instruction are not provided, and it is uncontradicted that plaintiffs are not allowed to use the gymnasium or the swimming pool on the grounds of the Training School.

The defendants counter by saying denial of the gymnasium is due to the security risks involved; many of the boys are con-

sidered runaways or a danger to the community. They also cite R.I.G.L. § 8–10–19 (1969)[4] as another reason for not using the gymnasium.

Of all the provisions in the Court's order none is easier to comply with than this one. The argument as to the security risk in the use of the gymnasium, which is approximately 400 yards away, is nothing but an unsupported statement. If there are security risks today, then they certainly existed in 1973 when the consent decree was entered. No evidence was offered establishing the factual predicate for this contention, nor have the defendants ever sought a change of the Court's order.

Likewise, the defendants' reliance on § 8–10–19 is misplaced. The issues here do not involve release, transfer, or parole of YCC residents.

### F. *Access to Books and Periodicals for YCC Residents*

It is uncontradicted that the YCC youths have never been permitted to use the library facility on the Training School grounds in spite of the Court's order enjoining them from confining any of the residents of the YCC without providing them with equal access to all books, periodicals, and other reading material located in the Training School. Defendants' contention that compliance entails a security risk is of no greater force here than it is in failing to utilize the gymnasium. The fact is the Court's order has been disregarded without any attempt to have it modified.

### G. *Canteen Service*

Paragraph 6(k) of the April 19 order requires that residents be provided "a meal on or after 5:00 o'clock p. m. daily, regular access to canteen services on at least two occasions each week, and daily access in their rooms to food brought in by parents and friends". It is uncontradicted that on

---

**4.** 8–10–19. Limitation on transfer or parole of juveniles.—During the period when a juvenile shall be placed in the receiving and screening unit or in the youth correctional center no transfer or parole of such juvenile shall be

made except with the consent of the chief judge of the family court, or, in his absence, with the consent of the justice who initially heard, or has pending before him, the matter involving such juvenile.

or about February, 1970 the canteen store at the Training School was closed. The defendants argue they have provided an adequate substitute. This may be so but the Court cannot so rule on the present record. Absent the presentation of a motion based on sufficient evidence justifying a modification, this Court must insist on strict compliance with paragraph 6(k) of the April 19 order.

### H. *Other Violations*

The plaintiffs further complain that from May 1976 to the present certain residents of BTS and YCC have been forced to sleep in hallways. The evidence does show that since November of 1976 overcrowded conditions existed on a sporadic basis totaling in all 68 days, and that such conditions violate the Court's order; it is also true that there was testimony that such overcrowding with sleeping in the hallways is dangerous since it creates friction between the boys. However, the Court cannot say that this practice has a set pattern. The quantum of evidence does not justify a finding by the Court.

Finally, the plaintiffs complain that from June 30, 1976 until August of 1976 Section III of the Comprehensive Classification and Treatment Plan which requires that "at least one clinical social worker shall be assigned to work full time with residents in each closed residential facility including the Youth Correctional Center . . ." was violated. For the period of time stated, this allegation is true. However, an individual has been hired to do this who, in the opinion of Ms. D'Amario, has qualifications equivalent to those of a clinical social worker. I do not find this complaint is of such magnitude as to warrant a finding by the Court.

### Conclusions of Law

This Court heard the plaintiffs' original claims for preliminary injunction in a context of rehabilitative rather than penal goals. *Inmates of the Boys' Training School v. Affleck,* 346 F.Supp. at 1365–1366. The consent decrees are designed to achieve such purposes, but unfortunately they have never been fully implemented. The defendants now offer in defense a variety of reasons, none of which were ever brought to the attention of this Court with such evidence as would justify modifying the decrees. It is evident that the defendants were either unaware of the binding effect of the judgment or insouciantly carried on their chosen course of conduct despite the decrees.

To begin with, "[a] consent decree is a judicial act, *United States v. Swift & Co.,* 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, with the same force and character therefore as a judgment rendered following a contested trial". *Kiwi Coders Corporation v. Acro Tool & Die Works,* 250 F.2d 562, 568 (7th Cir. 1959). What the trial might have developed, as to the actual merits of the various contentions, is no longer relevant. "Federal courts have held under a great variety of circumstances that a settlement agreement once entered into cannot be repudiated by either party and will be summarily enforced." *Cia Anon Venezolana de Navegacion v. Harris,* 374 F.2d 33, 35 (5th Cir. 1967). This is not the first time state officials of Rhode Island have been indifferent to settlements they negotiated and entered by consent. In *Morris v. Travisono,* 509 F.2d 1358 (1st Cir. 1975) a consent decree was entered establishing certain rules relative to prisoners' rights. It had no provision for injunctive relief and in an action to incorporate such relief the defendants objected, contending the rules were unworkable, unacceptable, and bothersome. Judge Campbell, speaking for the Court of Appeals stated that "[w]here the state officials erred was in failing to accord proper deference to the judicial decree. Distaste for the Rules did not allow defendants simply to disregard the court's judgment . . . and the fourteenth amendment rights declared under that judgment. *See* 28 U.S.C. § 2201. To the extent the Rules seemed unduly burdensome, the state had to seek modification by legal means. Had it done so, using diligence reasonable under the circumstances, this case would be in a different pos-

ture." *Id.* at 1361. The situation is no different here; the noncompliance has continued over a four year period after the Court's preliminary ruling that the juveniles had a constitutional and statutory right to receive rehabilitative treatment.[5]

In *Coalition of Black Leadership, et al. v. Vincent A. Cianci, Jr. et al.,* C.A. No. 4523 (D.R.I. July 18, 1977) [unreported opinion] a case also involving a consent decree which established certain procedures for citizens' grievances against the Police Department of the City of Providence, this Court stated that

> The rule has been laid down that, '[a]ll errors going to the merits and remediable upon appeal are waived by consent to the decree. If the court entering the decree had jurisdiction both of the general subject matter and of the parties, any objection to the merits is reviewable on appeal and is not open on a motion to vacate.' *Walling v. Miller,* [8 Cir.], 138 F.2d [629] at 631 (citation omitted). Furthermore, it is clear that 'jurisdiction', as used in the rule just cited, means power to adjudicate the controversy and render a binding decision; it does not refer to the various elements, such as standing or the existence of a real controversy, that limit plaintiffs' right to the relief sought. *Id.* at 632; *see General Investment Co. v. New York Central Railroad Co.,* 271 U.S. 228, 230 [46 S.Ct. 496, 70 L.Ed. 920]. (slip. op. at 7).

■ A decree, however, is not an immutable creature of the law imposing its force regardless of circumstances. The Court, of course, has the power to amend. As the Court said in *Coalition*

> [a] court of equity retains power to alter or amend its continuing decrees to reflect changed circumstances regardless whether those decrees are entered with the

consent of the parties or depend entirely on the coercive power of the court. *United States v. Swift & Co.,* 286 U.S. 106, 114–15 [52 S.Ct. 460, 76 L.Ed. 999] (1932). Modification of a decree may be appropriate (1) when the operative facts upon which it is premised have changed, (2) when there have been changes in relevant decisional law or, (3) when there have been changes in the applicable statutory law. *Flavor Corp. v. Kemin Industries, Inc.,* 503 F.2d 729, 732 (8th Cir. 1974); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2961 at 604–605. *See Therault [Theriault] v. Smith,* 523 F.2d 601 (1st Cir. 1975); *see also King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31, 35 (2d Cir. 1969). *Coalition of Black Leadership v. Vincent A. Cianci, Jr., supra.* (Slip. op. at 3–4).

■ No changed circumstances have been argued to this Court seeking alterations of the judgment. If there are any, the defendants have failed to seek such modification by legal means. Therefore, there is no reason why injunctive relief cannot be issued since the need for such relief is evident in the four year omission by the defendants to fully implement the Court's order. *Morris v. Travisono, supra* at 1362; 28 U.S.C. § 2202.

Defendants' attempt to avoid this conclusion by reliance upon *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), borders on the frivolous. In *Rizzo* the plaintiffs brought an action against the mayor and police officials contending they approved of "wide spread and systematic violations" of the plaintiffs' constitutional rights. After finding forty alleged incidents of police misconduct and a "pattern of frequent police violations" the District Court ordered implementation of a grievance and disciplinary procedure. The Su-

---

**5.** Thus, the constitutional validity of present procedural safeguards in juvenile adjudications, which do not embrace all of the rigorous safeguards of criminal court adjudications, appears to rest on the adherence of the juvenile justice system to rehabilitative rather than penal goals. *See State ex rel. Londerholm v. Owens,* 197 Kan. 212, 416 P.2d 259, 269 (1966).

The Rhode Island legislature, in establishing its juvenile justice system, has specifically directed that it have rehabilitative, nonpenal goals. Rehabilitation, then, is the interest which the state has defined as being the purpose of confinement of juveniles. *Inmates of the Boys' Training School v. Affleck,* 346 F.Supp. 1354, 1364 (D.R.I.1972).

preme Court held it could not do this absent some showing that the police officials had affirmatively encouraged depriving the plaintiff class of its constitutional rights. "*Rizzo* thus implies, if it does not clearly hold, that absent some showing of active supervisory encouragement of the unconstitutional conduct, proof of a 'pattern or practice' may no longer be sufficient for supervisory liability."[6] It follows that *Rizzo* is inapposite to the issue before the Court. The defendants in this case are the very officials who approved the programs under attack and are and were in complete control of the facilities.

 It is argued, and the Court agrees, that another distinction lies in the difference between the constitutional rights being put forward in each case. In *Rizzo* the issue was improved police procedures to handle civilian complaints—to which the District Court emphasized that respondents had no constitutional right. Here the right at issue is rehabilitative treatment—as directed by the Rhode Island legislature, and required by due process. *See, e. g., Nelson v. Heyne,* 491 F.2d 352 (7th Cir. 1974); *Creek v. Stone,* 126 U.S.App.D.C. 329, 379 F.2d 106 (1967); *Martarella v. Kelley,* 359 F.Supp. 478 (S.D.N.Y.1973) and 349 F.Supp. 575 (S.D.N.Y.1972); *Morales v. Turman,* 383 F.Supp. 53 (E.D.Tex.1974) and 364 F.Supp. 166 (E.D.Tex.1973).

Even if *Rizzo* were somehow apposite to the case at bar, defendants waived whatever legal defenses they may have had by consenting to the entry of a decree. *See Coalition,* slip op. at 6–7. There is no question that the Court has always had *in personam* and subject matter jurisdiction in this case; more is not required for a consent decree to be valid and binding, and defendants' reliance on *Rizzo,* even if otherwise appropriate, comes too late.

The Court orders that an injunctive order be framed by counsel for plaintiffs in accordance with this Opinion, requiring compliance with the 1973 decrees within six months. The Court will consider an exten-

sion of time for compliance for good cause shown.

---

6. The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 243 (1976).