D. JOSEPH JUDGE and RITA JUDGE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Judge v. Commissioner
Docket No. 6515-74.
United States Tax Court
T.C. Memo 1976-283; 1976 Tax Ct. Memo LEXIS 121; 35 T.C.M. (CCH) 1264; T.C.M. (RIA) 760283; September 7, 1976, Filed D. H. Markstein, Jr., for the petitioners. Roy S. Fischbeck, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal *122 income tax for the calendar years 1969 and 1970 in the amounts of $13,721.54 and $13,585.65, respectively. Some of the issues raised by the pleadings and at the trial have been disposed of by the parties, leaving for decision the following: (1) Whether petitioners are entitled to charitable contributions deductions claimed on the basis that the fair market value of land they sold to a charitable organization in 1969 was in excess of the sales price; (2) whether petitioners are entitled to depreciation deductions claimed in 1969 and 1970 on paintings used in one of petitioners' business offices; and (3) whether useful lives of two buildings owned and depreciated by a partnership in which petitioners had an interest were less than their useful lives as determined by respondent. FINDINGS OF FACT GENERAL Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Anniston, Alabama at the time of filing their petition in this case, filed joint Federal income tax returns for calendar years 1969 and 1970 with the Director, Internal Revenue Service Center, Chamblee, Georgia. At all times relevant hereto, D. Joseph Judge (petitioner) *123 was a physician engaged in the practice of pediatrics in Anniston, Alabama. For the purpose of clarity, the findings of fact and opinion will be separated by issues.
Issue 1. Fair Market Value of Land
FINDINGS OF FACT On or before July 24, 1967, petitioner became a member of a partnership called Delta Land Company (Delta). This partnership was composed of petitioner and three other individuals, whose respective interests were as follows: D. Joseph Judge
75.000%
Robert Propst
10.625%
Jack Wilson
10.625%
Donald Stewart
3.750%
Sometime around the early part of 1967 petitioner was informed by a man who did some farm work for him that a certain tract of 1,440 acres of land in Cleburne County, Alabama was available for purchase at $35 an acre. Petitioner owned an interest in some property about a quarter of a mile from the 1,440 acres, and in his opinion the $35 an acre was substantially less than the going price for land in the area. The other partners of Delta were partners in an Anniston, Alabama law firm. Petitioner informed them of the availability of the 1,440 acres, and they looked at the land and worked out arrangements for its purchase *124 with petitioner arranging all the financing. Delta purchased the property on July 24, 1967, at $35 per acre, a total price of $50,400. The Delta partners, other than petitioner paid only nominal amounts toward the purchase of the 1,440 acres. [1]
The 1,440 acres of land (hereinafter referred to as the Delta property) was comprised of two noncontiguous tracts, one 90 and one 1,350 acres, separated by approximately one-half mile. The land is situated in Southeastern Cleburne County, Alabama, about 90 miles east of Birmingham. Running through the Delta property is a paved road that connects the property with U.S. Highway 431 which, during the year 1969, intersected the principal Atlanta-Birmingham highway about 9 miles north of the Delta property. When the property was purchased by Delta and continuing through 1969, Interstate 20 was proposed and under construction 8 miles north of the Delta property. The area surrounding the property is sparsely populated, as is Cleburne County in general. In the area are tracts of land smaller than the Delta property which contain lakes in use as rustic recreation areas.The Talladega *125 National Forest adjoins the property, and Cheaha State Park is nearby. The Delta property itself was a relatively large tract of land ranging from fairly level to roughly rolling in terrain. Electricity and telephone service were available at all times here relevant. A clear stream ran through the property. The topography of the property was such that this stream could be dammed so as to produce an artificial lake of appreciable size. During the period here involved, petitioner was involved in several land holdings with some or all of the other Delta partners. The parties decided that a consolidation of these holdings was necessary, and toward that end as part of an arrangement involving other properties petitioner purchased from Messers. Propst, Wilson, and Stewart their collective 25 percent interest in Delta on May 12, 1969, for $25,200. The only assets of Delta were $1,928.29 in cash and the 1,440 acres of property. The sale price for the Delta partnership interests was determined by the parties after the sale by allocating to the interests part of a total price set for all of the holdings of the parties. The total amount was determined by the parties not principally *126 on the basis of the value of the underlying property but considering interalia relative investment in the properties and the value of petitioner's services to the enterprises. Petitioner's allocation to the Delta interests of the amount of $25,200 was made for the purpose of preparation of his income tax returns. During the period that only petitioner owned the Delta property, he contracted with a division of Kimberly-Clark Corporation for management services for the land. Kimberly-Clark developed the timber, provided fire protection, and advised on timber sales. At the termination of this arrangement during 1969, Kimberly-Clark made an offer to purchase the land from petitioner for $85 per acre and petitioner rejected it. Kimberly-Clark wanted the land for development of timber for use in its business. Although the offer to purchase the land was at $85 per acre, the representative of Kimberly-Clark through whom the offer was made, a man with 25 years experience managing and acquiring timberland, was of the opinion that property acquired for timber purpose in the area of the Delta property was worth about $100 per acre when the offer was made.
Also during the period *127 when he was sole owner of the Delta property, petitioner began construction of a lake on the property. He consulted with the Soil Conservation Service of the Department of Agriculture regarding a lake, and he employed a contractor to begin construction. For several years prior to 1969, the Birmingham Area Council, Inc., Boy Scouts of America (Boy Scouts), had been looking for a suitable area for a Boy Scout camp in the central Alabama region. They were interested only in a fairly large tract, at least 1,000 acres, with a lake or a stream suitable for creation of an artificial lake. The Council preferred land near an interstate highway for safe and quick transportation. A real estate broker, working independently, contacted petitioner regarding sale of the Delta property but initially withheld from petitioner the identity of the prospective purchaser.Petitioner at first informed this real estate broker that he would not sell the Delta property. However, when the broker informed petitioner that the prospective purchaser was a charitable organization and suggested that petitioner could obtain both a capital gain on the sale and a charitable contribution deduction, petitioner *128 became interested in investigating the proposal made by the broker. Petitioner then learned that the prospective purchaser was the Birmingham Area Council of the Boy Scouts. Petitioner had a history of activity relating to the Boy Scouts, including donation of services and serving on executive committees. The broker negotiated petitioner's asking price down from $104 per acre to $80 per acre net to petitioner, i.e., the receipt of $80 after reduction for commissions. Petitioner entered the sale with the intent to make a bargain sale to the Boy Scouts and a gift to them of the excess of the fair market value of the property over the sale price. Negotiators for the Boy Scouts initially were not informed by the broker of petitioner's intention to obtain a charitable deduction on the sale and negotiated with the broker on an arm's length basis to obtain as low a price as possible. On October 15, 1969, after receiving a determination from their engineer that the property was sutable for the proposed camp, the executive committee of the Boy Scouts authorized and directed the president of the Birmingham Area Council (1) to negotiate the purchase of the 1,440 acres for use by the *129 Boy Scouts as a camping facility at a price not to exceed $126,500, (2) to sign a real estate contract for the purchase of the 1,440 acres, and (3) to execute any and all documents necessary to effect the purchase of the acreage for and on behalf of the Birmingham Area Council. On November 5, 1969, the president of the Birmingham Area Council and petitioners executed a contract for sale of the Delta property, which read, in part, as follows: 2. The purchase price shall be One Hundred Twenty-Five Thousand Seven Hundred Dollars ($125,700.00) payable as follows: * * *
(a) An appraisal of the above described property is being made by a qualified real estate appraiser, and the obligation of Seller to convey as set out in this agreement is contingent on the said appraisal showing fair market value of the said property to be not less than One Hundred Eighty Thousand Dollars ($180,000.00). If the appraisal is less than this figure, then Seller shall have no liability to pay the fee of the appraiser, but Seller shall be entitled to retain a copy of the appraisal. (b) As earnest money, the Buyer, upon the execution of this agreement, has paid to the Seller the sum of Eleven Thousand *130 Two Hundred Dollars ($11,200.00) to be applied on account of the purchase price or refunded if the Seller declines to convey under paragraph (a) above. (c) On or before January 6, 1970, but not before January 2, 1970, the Buyer shall pay to the Seller the additional sum of $38,000.00 in cash on account of the purchase price. (d) On or before December 31, 1970, but not before January 2, 1970, the Buyer shall pay to the Seller the additional sum of Thirty-Five Thousand Dollars ($35,000.00) in cash on account of the purchase price plus interest at the rate of eight percent (8%) per annum from the date hereof until the date of payment. (e) On or before July 1, 1971, but not before January 2, 1971, the Buyer shall pay to the Seller the additional sum of Forty-One Thousand Five Hundred Dollars ($41,500.00) in cash on account of the purchase price plus interest at the rate of six and three-fourths percent (6-3/4%) per annum from the date hereof until the date of payment. * * *
(5) The closing date shall be December 1, 1969, and the closing shall be consummated and concluded at the offices of * * * attorneys for the Seller. * * *
(7) The Buyer represents to the Seller that this *131 agreement was procured only by and through the efforts of Robert L. Crook, Hamilton Perkins, Sr. and Joe Rigsby as brokers, and that it has dealt with no other salesman or broker in connection therewith. (8) All of the parties recognize that the land in question is worth considerably more than the purchase price agreed upon herein; and they agree that the difference between the purchase price and the value as determined by an independent appraisal shall be deemed a contribution by the Seller to the Buyer. In December 1969 the Boy Scouts executed a mortgage in favor of petitioners on the Delta property in the amount of $114,500, which was evidenced by a promissory note securing the unpaid purchase price. On December 18, 1969, petitioners executed a deed conveying the 1,440 acres to the Boy Scouts. While an appraisal of the property was a prerequisite to acceptance of the sale by the Boy Scouts, the appraised value of $180,000, required in paragraph 2(a) of the sales contract, was set by petitioner as his own estimate of a fair price considering that the sale was to a charitable organization. The appraisal commissioned by the Boy Scouts was arranged by the broker and was *132 prepared by three men, John D. Chichester, listed on the report as "Real Estate Consultant-Appraiser," and Henry Long and John D. Chichester, III, listed as associate appraisers. These appraisers were of the opinion that they were appraising the property for gift tax purposes. John D. Chichester has worked as a real estate appraiser since 1922. His clients have been many and varied, including numerous Federal agencies, attorneys, and business institutions. He is a member of the American Society of Real Estate Counselors and the American Institute of Real Estate Appraisers, and a past officer of various local, state, and national professional organizations. Henry Long is an officer of First National Bank of Birmingham. He has worked in farm and timber management and appraisal for that institution for 8 years and in the appraisal department of the Federal Land Bank of New Orleans for 4-1/2 years. He is a member of various professional associations and at the time of the trial was a candidate for membership in the American Institute of Real Estate Appraisers. John D. Chichester, III, son of the elder Mr. Chichester, has worked with his father as an appraiser since 1964. At the *133 time of the trial, he was a member of the American Institute of Real Estate Appraisers and other professional organizations, although he was only a candidate for membership in the former when the appraisal was prepared. The appraisal made by Messrs. Chichester and Long was based on an analysis of various sales of other property which are referred to in the appraisal as "comparable" to the Delta property. This appraisal was based on the highest and best use of the Delta property being recreational development. The sales on which the appraisal was based, with date of sale, location, size and price, were as follows: Size in
Price Sale
Date
Location
Acres
Per Acre
1
6-1-68
St. Clair Co.
112
$446.00
2
3-28-69
Talladega Co.
900
278.00
3
9-6-67
Calhoun Co.
70
300.00
4
10-17-67
Cleburne Co.
225
80.00
5
10-14-69
Randolph Co.
404.2
127.50
6
3-12-69
St. Clair Co.
235
138.00
Sale No. 1 in the above table is property that partially fronted on a large lake and contained subdivided lots. At the time of the sale there were present on the property a marina and an 18-hole golf course. It was in an area *134 of extensive development in St. Clair County about 50 miles from Birmingham.The terrain was relatively level, and electricity, water and telephone service were available to this property at the time of its sale. Property No. 2 in the above table fronted on a large lake and was also around 50 miles from Birmingham. This property was less developed than Property No. 1, and no running water was available to the property at the time of the sale. The land was purchased for development of a resort hotel, country club, and homesites, and the terrain was relatively level. This property had been sold in 1968 in a prior transaction for $169 per acre under threat of foreclosure. Property No. 3 in the above table was purchased for development of a country club a few miles north of Anniston in Calhoun County, Alabama. The terrain was relatively level, and the utilities available to the property included water, electricity and telephone. Property No. 4 in the above table was land situated quite near the Delta property in Cleburne County and consisted of two noncontiguous tracts.
Property No. 5 listed in the table was located about 106 miles from Birmingham in Randolph County, and Property *135 No. 6 was located about 70 miles from Birmingham in St. Clair County. Property No. 6 consisted of noncontiguous parcels. In May of 1972, Mr. Gene Dilmore, at the request of representatives of the Internal Revenue Service, made an appraisal of the Delta property as of November 5, 1969. Mr. Dilmore is a member of the American Society of Real Estate Appraisers, the American Institute of Real Estate Appraisers, and numerous other professional organizations. He has published articles and had formal training in the field of real estate appraisal.He has appraised property since 1954 for Government agencies, attorneys, and business institutions. Mr. Dilmore's appraisal of the Delta property was on the basis of its highest and best use being for recreational purposes and its second best use being as timberland. Mr. Dilmore's appraisal was based on an analysis of various sales of other properties referred to in his appraisal as being "comparable" to the Delta property. The sales he used in his appraisal were all of tracts of land larger than 20 acres in Cleburne County (and in one instance in a nearby part of Clay County). The sales on which Mr. Dilmore's appraisal was based, with *136 date of sale, location, size and price, were as follows: Size in
Price Sale
Date
Location
Acres
Per Acre
A
5-6-69
Cleburne Co.
39.93
$125.00
B
11-5-71
Cleburne Co.
80.16
300.00
C
Apr.1971
Clay Co.
520
70.00
Cleburne Co.
120
70.00
D
9-5-69
Cleburne Co.
80
93.75
E
4-30-70
Cleburne Co.
160
50.00
F
7-17-69
Cleburne Co.
50
80.00
Property "A" listed in the above table consisted of slightly rolling land purchased by the Federal Government for use as a national park. A creek suitable for creation of a lake ran through this property, and the land bordered on a paved road. Property "B" was rolling land also purchased for a national park. There was an existing lake and a paved road on the property. Property "C" consisted of one large tract of 520 acres and four smaller ones of a total of 120 acres. The terrain of this property was rolling, and a creek ran through the property. Access to all of these parcels was difficult as there were no developed roads through any of the tracts. Property "D" was fairly level land fronting on a paved road through which ran a creek. Properties "E" and *137 "F" were similar to "D" except that their terrains were respectively roughly rolling and rolling. Properties "C", "D", "E", and "F" were purchased for investment. The following schedule shows the population density of the counties indicated: Population
Area
Population County
1970
In Sq. Miles
Per Sq. Mile
Cleburne
10,996
574
19.16
St. Clair
27,956
640
43.68
Calhoun
103,092
611
168.73
Randolph
18,331
581
31.55
Talladega
87.00
On their Federal income tax return for the calendar year 1969 petitioners showed a noncash contribution to the Boy Scouts of $172,050.This contribution was explained as "1440 acres land given to Birmingham Council Boy Scouts for a boys camp [;] appraisal made by independent professional appraiser as of date of gift [;] appraised value [$172,050] of gift." The total charitable deduction claimed by petitioners on their 1969 return was $12,710, consisting of cash contributions of $4,789 and $7,921 of the $172,050 noncash contribution. The amount of $12,710 was shown on petitioners' return as the charitable deduction allowable under the limitation on such deductions provided for in *138 section 170(b)(1), I.R.C. 1954. [2]
Petitioners also reported in 1969 a long-term capital gain of $50,254 on the sale of the land. Petitioners derived this figure by subtracting from the sale price of $125,450 their claimed basis of $64,691 and sales expenses of $10,500. The gain on this sale was reported on the installment basis. In their 1970 return petitioners carried over noncash contributions of $164,129, made further cash contributions of $4,248, and deducted $20,043, including $15,795 of carryover of the noncash contributions. They also recognized $29,244 long-term capital gain from the deferred payment sale of the Delta property. Respondent in his notice of deficiency to petitioners disallowed the noncash contributions deduction of $7,921 claimed in 1969 and the $15,795 noncash contributions carryover to 1970 attributable to the claimed gift in 1969 of land to the Boy Scouts. Respondent in his notice explained that it had not been established that the value of the land was in excess of the sales price. OPINION *139 Section 170 allows to a taxpayer who makes a charitable contribution a deduction in the tax year in which paid with a limitation on the total amount of such contribution deducted and a carryover of the excess. The contribution must be made with the intent to make a gift, rather than in the expectation of reciprocal consideration. See Larry G. Sutton,57 T.C. 239, 242-43 (1971); Harold DeJong,36 T.C. 896, 899 (1961). Where a bargain sale is made to a qualifying charitable organization with the requisite intent, a deduction is allowed for the difference between the fair market value of the property at the time sold and the sales price. William Waller,39 T.C. 665, 677 (1963). The fair market value of property other than cash is, under respondent's regulations, "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170-1(c)(1), Income Tax Regs.
The evidence here is clear that petitioners sold the Delta property to the Boy Scouts with the intent to make a gift to them of the excess *140 of the fair market value of the land over the sales price, and we have so found. Since the parties here agree as to the amount of the sales price, the only issue to be decided is the fair market value of the Delta property on the date of the sale by petitioners, November 5, 1969. Respondent's first contention in this case is that since the Boy Scouts negotiated with a broker at arm's length for the purchase of the Delta property, the price paid for that property is its fair market value. Certainly the bast evidence of the fair market value of property at a given time is the price at which that particular property changed hands between willing buyer and willing seller, neither being under any compulsion and both having a reasonable knowledge of the relevant facts. However, in our view, the actual sale by petitioner of the Delta land to the Boy Scouts did not reflect fair market value. The facts show that the Boy Scouts negotiated with the broker, in effect representing petitioner, at arm's length and attempted to acquire the property at the lowest price possible. Usually such negotiation produces a sale at fair market value. However, in the instant case, both petitioner and the *141 Boy Scouts wanted to see the boys camp located on the property. While the buyer wanted the lowest price possible, petitioner did not try to obtain the highest price. Petitioner sought only an intermediate figure, marking the division between the portion of land sold and that portion given away. The real nature of the negotiation in this case was bargaining over the relative amounts of the gift by petitioner and of the sale. Only these two amounts taken together constituted the fair market value of the land. It is obvious that a seller not intending any gift would have demanded an economic consideration for both portions, thus leading to a higher price. Likewise, the prior purchases of the Delta property do not reflect fair market value. The initial purchase by Delta for $35 per acre occurred well before the time here in question. The property was purchased merely as a nonproductive investment, and not for production of timber for cutting or for immediate recreational use, each a succeedingly more valuable use. Neither does the record fully reflect the circumstances of the original seller of the property. The subsequent purchase of the outstanding interests in Delta, a *142 partnership whose principal asset was the Delta property, does not reflect fair market value on this record. The purchase price paid by petitioner, equivalent to approximately $69 per acre, was not set principally by an examination of the value of the underlying land but primarily by consideration of other factors, including the relative contributions of the partners to the firm. While the purchase price paid by the Boy Scouts does not reflect fair market value, it does indicate a minimum value. Since the Boy Scouts negotiated with petitioner at arm's length, seeking the lowest price possible and intending no gift, the fair market value is not less than the $80 per acre paid for the property. For the same reason, in our view the $85 offer by Kimberly-Clark, a legitimate offer by a willing buyer, also sets a floor for the fair market value at the time that offer was made, which was in the same year as the sale to the Boy Scouts. The rejection of this offer by petitioner is some evidence that the fair market value of the property at the time of the offer, before the date here in question, was greater than $85 per acre. It is also important that the offer made by Kimberly-Clark *143 was for an intended use of the land for timber cutting. The evidence indicates that land sold for recreational use generally would bring a higher price than land sold for timber cutting. Given this starting point, we have determined the fair market value of the Delta land on November 5, 1969, by considering the testimony of all the experts offered by the parties and examining the sales offered to this Court by the expert witnesses which these witnesses referred to as "comparable" to the Delta property. The qualifications of these witnesses, particularly Mr. Dilmore and Mr. Chichester, Sr., are impressive. The Court does not question the integrity of any of the expert witnesses who testified. Nevertheless Mr. Dilmore concluded that the value of the land on November 5, 1969, was $77.50 per acre and the Messrs. Chichester and Mr. Long concluded that the value of the land on that same date, exclusive of the value of the standing timber, was $175 per acre. As the foregoing discussion shows, in our view the value placed on the land by Mr. Dilmore was too low. In our view the value placed on the land by the Messrs. Chichester and Mr. Long was too high under the facts shown in this *144 record. It is worthy of note that all of the expert witnesses used the same underlying approach to determining the value of the land. All of the experts valued the land on the basis that its highest and best use was for recreational purposes and that the nature of the stream on the land and its topography were such that an artificial lake could readily be constructed on it. All the experts used a "market value" or "comparable" sale approach to arrive at value. The large difference in the price per acre arrived at by petitioners' experts and that arrived at by respondent's expert resulted from the properties considered comparable in the appraisal and the adjustments the experts deemed necessary for differences in the "comparable" and the Delta property. "Comparable" sales 1, 2, and 3 of the Chichester report were of properties more extensively developed than the Delta property and with utilities available which were not available to the Delta property. Two of these properties were within 50 miles of Birmingham on an already constructed lake, and were much more level than the Delta property, causing them to be suitable for resort development. The other of these three properties *145 was within 15 miles of Anniston, Alabama, with terrain suiting the property for use as a country club. Of the sales presented in the Chichester report, only numbers 4, 5, and 6 are sufficiently similar to the Delta property to be of help to the Court in determining fair market value of the Delta property. The record does not disclose the precise use to which these tracts were put but merely that it was recreational or nonfarm use. "Comparable" sales C, D, E, and F of Mr. Dilmore's report were not purchased for direct recreational use, but for investment. Therefore, the sales prices reflected would be expected to be somewhat low as compared to land sold for recreational use. These tracts were in the proximate vicinity of the Delta property and the terrain of the properties was somewhat comparable to that of the Delta property.The sales price of "Comparable" C would however be expected to be low in comparison to the Delta property because of the poor access to that property as compared with that of the Delta property. "Comparable" sales A and B were purchased for a national park. This use for rustic recreation compares favorably with the use of the Delta property by the Boy *146 Scouts and these properties appear otherwise fairly comparable to the Delta property except for size and the presence of a lake on "Comparable" B. Mr. Dilmore stated that in his opinion a 55 percent discount was necessary to account for the value of an already constructed lake. While this percentage might be appropriate as a discount of the small 80-acre tract of "Comparable" B, it would appear to be unreasonably high as a discount for a 1,440 acre tract such as the Delta property. [3]
The Court has weighed all the evidence before it and has considered not *147 only the opinions expressed by all the expert witnesses but also the basis underlying those opinions. Factors we have considered in determining the weight to be placed on the so-called "comparable" sales include proximity of the sale in time to the valuation date of the Delta property, intended use of the property sold, the location of the property sold, the accessibility and terrain of the "comparable," the trend of land prices during the pertinent period, the size of the property sold, the extent to which parcels sold were contiguous, and other relevant facts. We conclude that the value of the Delta property on November 5, 1969, was $115 per acre, or a total value of $165,000 for 1,440 acres. Issue 2. Depreciation on Paintings
FINDINGS OF FACT From 1963 through 1969, petitioner acquired a number of paintings from European art dealers through catalog purchases.The paintings were of clowns, dogs, birds, children, and other subjects intended to be of interest to children. The costs of the paintings and frames were as follows: Acquired During
Total Cost
1963
$ 694.13
1964
1,370.00
1966
250.00
1968
160.00
1969
858.00
$3,332.13
*148 The paintings were purchased for use in petitioner's professional offices. They were used for decorative purposes and were removed when the offices were refurbished.Petitioner retained some of the pictures, stored in a closet, and gave some away. Some of the paintings were defaced by young patients of petitioner. Only one of these paintings remained on display in petitioner's office at the date of the trial of this case. In their Federal income tax returns for the calendar years 1969 and 1970, petitioners deducted from their gross income depreciation on the paintings in the amounts of $290 and $333, respectively. These amounts were determined by using the straight line method of depreciation, a 10-year useful life, and zero salvage value. In his notice of deficiency to petitioners, respondent disallowed the $290 and $333 deductions, stating that "[it] has not been established that these paintings have a determinable useful life." OPINION Section 167(a) provides: * * * There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or *149 business, or (2) of property held for the production of income. The paintings here in issue were used in petitioner's trade or business during the relevant tax years.The record indicates that they were used solely for the purpose of decoration of petitioner's business offices and not for any personal or nonbusiness use. Therefore, if the useful life and salvage value of the paintings were shown, petitioners would be entitled to an appropriate deduction for depreciation. Some of the paintings which are still in petitioner's possession are stored. The record is not clear whether the paintings petitioner testified he "gave away" were in fact given to unrelated persons or lent for use in offices of a clinic operated by a corporation in which petitioner was the major, if not sole, stockholder. The record is not clear whether petitioner intends again to use the stored paintings for display in his offices.
For property used in the trade or business to be depreciable under section 167, it must have a determinable useful life. See *150 Potts, Davis & Co. v. Commissioner,431 F. 2d 1222 (9th Cir. 1970), affg. T.C. Memo. 1968-257. Respondent has determined that petitioner's paintings have no determinable useful lives and therefore that they are not depreciable. In order to show error in respondent's determination petitioner must establish that the paintings had a determinable useful life, and he must show what that life is. Respondent cites in support of his position Revenue Ruling 68-232, 1968-1 C.B. 79, which states in pertinent part: A valuable and treasured art piece does not have a determinable useful life. While the actual physical condition of the property may influence the value placed on the object, it will not ordinarily limit or determine the useful life. Accordingly, depreciation of works of art generally is not allowable. The apparent rationale of this ruling is that physical deterioration generally does not cause an end to the useful life of works of art within any determinable period. In our view, the record here is sufficient to show that the paintings acquired by petitioner were more wall decorations than works of art. [4] The record here shows that *151 the paintings acquired by petitioner were by unknown artists and were not of the kind ordinarily considered "valuable and treasured" works of art. The paintings were acquired by petitioner for business use and their economic useful life in petitioner's business would be a proper basis for depreciation if petitioner had established this economic useful life and the salvage value of the paintings so that the amount of depreciation could be determined. *152 However, the facts in this record give no indication of the economic useful life of the paintings. The record does not show the frequency of redecoration of petitioner's offices or even an estimate of how often such redecoration might be necessary. While the normal period for redecoration of petitioner's offices might well be a determinable one, this has not been shown in this record. Furthermore, this record is unsatisfactory in many other respects. The stipulated cost of these paintings and frames on which petitioner claimed depreciation was $3,332.13. Petitioner testified that the total number of paintings he acquired was 12. Accepting these two facts, simple mathematics shows the cost of the paintings and frames to average $275 each. However, petitioner testified that none of the paintings cost over $100 and most of them cost $50 or less. It is not clear whether this cost was of the paintings only or of the paintings and frames. If we assume petitioner was referring only to the paintings, then petitioner must have put $50 paintings into $225 frames. There is nothing in this record to show the useful life of such relatively expensive frames, or why these frames would be *153 discarded instead of reused when the paintings might be changed because of redecoration of petitioner's offices. There is nothing to show what the estimated salvage value of these pictures and frames was when they were acquired. The salvage value might have been equal to or nearly equal to the cost of the paintings and frames. Therefore, since this record contains no proof of either the useful lives of the paintings or their salvage value, petitioner has not carried his burden of proof of showing that he is entitled to depreciation deductions for the paintings. Even though we accept petitioner's contention that the paintings were office decorations and not works of art, petitioner has failed to meet his burden of proof of showing either their useful lives or salvage value.We therefore sustain respondent's determination.See Pohlen v. Commissioner,165 F. 2d 258, 259 (5th Cir. 1948), affirming a Memorandum Opinion of this Court. Issue 3. Useful Life of Buildings
FINDINGS OF FACT During 1963, petitioner was a shareholder of CCB of Anniston, Inc., a corporation formed to purchase a building in Anniston, Alabama (the Chamber of Commerce Building). The Chamber *154 of Commerce Building was constructed of brick before World War I. It was purchased in 1961 by a partnership and renovated. Although no basic structural changes were made, a new floor, accoustical ceiling, plumbing fixtures, and heat pump were installed. The stairs were repaired, a new roof was installed, and a false front was attached to the building. These improvements, which cost about $20,000, did not extend the useful life of the building. CCB of Anniston, Inc. purchased the Chamber of Commerce Building in 1963. It began depreciating the property on the basis of a 15-year useful life. In October of 1968, the corporation was dissolved and CCB Partners, a partnership, took title to the property. CCB Partners during the calendar years 1969 and 1970 was composed of the petitioners. During those years, the partnership depreciated the building using the 150 percent declining balance method, based on a new 15-year useful life starting in 1968. The interior of the Chamber of Commerce Building was extensively improved by CCB of Anniston, Inc. prior to 1968 to ensure the continued occupancy of its principal tenant, the Anniston Chamber of Commerce. The building had no parking *155 lot, although parking was available on the street. In November of 1964, CCB of Anniston, Inc. constructed on its own land a small one-story, yellow brick building (the Cablevision Building). A parking lot was subsequently built. The building was constructed specifically for a particular tenant, a cable television company. The lease with this tenant provided for a 5-year term, but the tenant has continued to occupy the building since this 5-year term expired. The Cablevision Building became the property of CCB Partners on the dissolution of CCB of Anniston, Inc. in October of 1968. During the calendar year 1969, the partnership depreciated the building using the 150 percent declining balance method, and for the calendar year 1970 it used the double declining balance method. Both methods were based on a 20-year useful life starting in 1968. The change in depreciation method in 1970 was made without the permission of the Commissioner of Internal Revenue. Both the Chamber of Commerce Building and the Cablevision Building were located on or near Noble Street in the downtown area of Anniston, Alabama. The economic and physical conditions of the immediate area of these buildings *156 were not good during 1969 and 1970. The area had been deteriorating and was expected to continue on this trend. The buildings in the area were mostly older ones, and many were chronically vacant. In their Federal income tax return for the calendar year 1970, petitioners reported a distributive share of partnership loss attributable to CCB Partners totalling $11,451.18.In his notice of deficiency to petitioners, respondent decreased their distributive share of partnership loss because of a reduction in the depreciation deduction claimed by the partnership on the Chamber of Commerce and Cablevision Buildings. This reduction was caused by an increase in the useful lives of the two buildings from 15 to 20 years for the Chamber of Commerce Building and from 20 to 33-1/3 years for the Cablevision Building. Also, the depreciation method used for the Cablevision Building was limited to 150 percent declining balance. [6]
OPINION Section 167 allows a taxpayer a deduction from gross income for depreciation. [7] Under respondent's regulations, the amount of the deduction is "that amount which should *157 be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and § 1.167(g)-1." [Sec. 1.167(a)-1(a), Income Tax Regs.] This Court in the instant case is presented with determining the useful lives of the two buildings here involved. Respondent's regulations provide: Sec. 1.167(a)-1(b) [Income Tax Regs.] Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress *158 of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * * *159 Respondent has determined the useful lives of the Chamber of Commerce and Cablevision Buildings to be 20 and 33-1/3 years, respectively. [8] These determinations are presumptively correct, and the burden is on petitioners to show them erroneous. M. Pauline Casey,38 T.C. 357 (1962). Toward this end, petitioners presented several witnesses. Each was familiar with the building about which he expressed an opinion, and each had been a member of an organization at one time owning the building. A member of the partnership which renovated the Chamber of Commerce Building and sold it to CCB of Anniston, Inc. in 1963, testified that the remaining useful life of that building in 1963 was only 12 to 15 years. However, the proper useful life to be used by petitioners must be determined on "facts known or reasonably anticipated at the end of the year for which depreciation is taken." M. Pauline *160 Casey,supra, at 381. Thus, changes in the environment, and in the physical and economic conditions of the building subsequent to 1963 would require a reevaluation of this opinion. In this case, the physical condition of the building may have been improved by 1970 by certain renovations, while the environment may have deteriorated. A former shareholder in CCB of Anniston, Inc., who is a certified public accountant, and petitioner each testified that the useful life of the Chamber of Commerce Building in 1963 was 15 years. However, the useful life employed by CCB Partners after 1968 was 15 years measured from that date. Petitioner and another witness testified that the useful life of the Cablevision Building was 20 years from the date of its construction in November of 1964.However, in 1968 when the property was acquired by CCB Partners, a 20-year useful life from that later date was employed. The sole witness for respondent was a revenue agent. He testified that he had examined the buildings and the area. His experience with other properties led him to the figures assigned by him as the useful lives of both properties, 20 and 33-1/3 years from 1968, *161 respectively. The evidence before the Court indicates that the useful life of the Chamber of Commerce Building in 1963 was, in fact, 15 years. Any subsequent improvements did not extend the useful life of the building more than 5 years, especially considering the accelerating deterioration of the area. Thus, the remaining useful life of this building when acquired by CCB Partners in October of 1968 has been shown on this record not to have been more than 15 years beginning in 1968. No significant factors appear which would require a change in the estimate for the petitioners' 1970 tax year. The primary testimony petitioner relies on to support his claim of a useful life of the Cablevision Building of 20 years is the fact that it was constructed specifically to meet the needs of its tenant.However, there is no evidence to indicate that the building was not suitable for other tenants without substantial alterations, and in fact the evidence tends to show that it was suitable for other tenants. The effect, if any, of the deteriorating area in which the Cablevision Building was located on the economic useful life of that type of building has not been shown. This Court has examined *162 the record and considered all relevant factors, including the location, environment and condition of the buildings and the prevailing trend of the area. We hold that the useful life of the Chamber of Commerce Building to be used in the tax year in issue was 15 years, measured from October 1968. We hold that petitioners have failed to show that the useful life of the Cablevision Building was less than the 33-1/3 years determined by respondent. Decision will be entered under Rule 155.
Footnotes
1. Partner Robert Propst paid no more than $747.74.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. While 55 percent of the value of a smaller tract may accurately reflect the cost and trouble of creating a lake, given the proper conditions for one, that percentage of the value of a tract the size of the Delta property would seem far too high a reflection of the cost of approximately the same size lake. Based on Mr. Dilmore's valuation and using his figure of a 55 percent discount, a small lake present on the Delta property would increase its value by $91,309.09, other factors being equal. This figure seems grossly excessive considering the evidence here of the ease with which a lake could be built on this property.↩
4. See John R. Thompson Co. v. United States,338 F. Supp. 770, 778-779 (N.D. Ill. 1971), affd. 477 F. 2d 164 (7th Cir. 1973), in which the court approved of the application of Rev. Rul. 68-232, 1968-1 C.B. 79↩, to the facts before it. That case involved 57 oil paintings purchased for $252,500 in 1929 which were used by the taxpayer as permanent decorations in its restaurant until its property was condemned in 1962. The taxpayer's primary position was that a loss occurred on condemnation of the property in the amount of the difference between the cost and the then fair market value of the paintings. As an alternative the taxpayer claimed depreciation.In addition to finding these paintings nondepreciable under the rationale of the revenue ruling, the court found that no determinable useful life had been proved.
6. Petitioner has not contested this determination regarding depreciation method.↩
7. SEC. 167. DEPRECIATION. (a) General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, or (2) of property held for the production of income.↩
8. These figures represent useful lives beginning in 1968. Both buildings were depreciated prior to 1968, the year in which CCB Partners acquired them and established its depreciation method.↩